UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **RICH LAND SEED CO INC** | **CASE NO.  3:21-CV-01070** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **B L S W PLEASURE CORP, ET AL.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

### MEMORANDUM ORDER/RULING

On July 12, 2023, Defendant Hallmark Specialty Insurance Company("Hallmark") filed a Motion for Summary Judgment on Coverage [Doc. No. 137]. Plaintiff Rich Land Seed Company Inc. ("Plaintiff") filed a response in opposition [Doc. No. 143], and Hallmark filed a reply [Doc. No. 145].

For the following reasons, Hallmark's Motion is **DENIED**.

### I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff filed suit in state court on March 9, 2021, and the matter was removed to this Court on April 21, 2021.[1] In the complaint, Plaintiff alleged that WG Gas, LLC ("WG Gas") contaminated their properties through oil and gas exploration activities.[2] Plaintiff has a long history of mineral leases on properties in Richland and Morehouse Parishes, stretching back to 1920. The contamination alleged in the instant suit comprises oilfield waste, including radioactive material, produced water, drilling fluids, chlorides, hydrocarbons, and heavy metals.[3] These pollutants are allegedly polluting both surface and subsurface areas of Plaintiff's land.

---

[1] [Doc. No. 1]
[2] [Id.]
[3] [Id.]

In 2012, Plaintiff leased acreage to WG Gas for drilling operations, specifically involving four wells with serial numbers 139808, 248895, 247893, and 141221.[4] The lease was extended until July 27, 2018, enabling continuous production efforts for up to twenty-four months.[5] The lease required WG Gas to maintain liability insurance coverage of at least two-million dollars per occurrence and adhere to environmental laws and regulations.[6]

Workover activities occurred on multiple well sites, including re-entry and tubing pulling. Well serial numbers 139808, 247893, and 141221 could produce gas and saltwater, with instances of gas emissions observed during workovers and tests.[7] The well sites and equipment were deteriorated and non-compliant with Statewide Order 29-B.[8] Experts, including Hallmark's, acknowledged the poor condition and non-compliance.[9] The debris, rusted equipment, and unsafe conditions failed to meet regulatory standards.[10] Estimated costs to bring the sites into compliance are substantial, and Plaintiff's expert asserts that the figure from Hallmark's expert is insufficient.[11]

Hallmark issued an insurance policy to WG Gas, covering activities from May 3, 2018 to May 3, 2019.[12] WG Gas and its contractors worked on the wells during the policy period, addressing various issues. However, WG Gas's operations did not align with the lease or regulations, and the condition of the well sites was substandard.

Hallmark was added to the suit on October 13, 2021, and is allegedly liable under the 2012 lease terms and Louisiana law for property restoration.[13] Plaintiff asserts that the Hallmark

---

[4] [Doc. No. 143, p. 4]
[5] [Id.]
[6] [Id. at p. 5]
[7] [Id. at p. 6]
[8] [Id.]
[9] [Doc. No. 137-4]
[10] [Doc. No. 143-3, ¶ 14]; [Doc. No. 143-4, pp. 121–122]
[11] [Doc. No. 143, p. 12]
[12] [Id. at p. 6]
[13] [Doc. No. 38]

Commercial Liability Policy ("the Policy") covers alleged acts of negligence and/or property damage caused by WG Gas. Specifically, Plaintiff asserts that deposition testimony revealed contamination around WG Gas wells, especially near a Salt Water Disposal Well ("SWD") site, and aims to establish coverage of claims under the Policy based on this evidence.[14]

WG Gas stopped well operations in 2018 or 2019, resulting in the Louisiana Department of Natural Resources ("LDNR") designating orphan status due to unresolved issues and debris.[15] The abandoned wells posed safety hazards, with unstable equipment, corroding tanks, and leaks. Further, the LDNR's orphan well program lacked funds to address the problems.[16]

The primary issue in this Motion is whether Plaintiff's claims, centered on localized contamination and well abandonment, fall within the Policy's coverage scope. Hallmark argues that specific Policy exclusions unambiguously exclude property damage from pollution. In response, Plaintiff argues that Hallmark seeks to narrowly construe the Policy to exclude coverage, despite the presence of riders granting coverage specific to WG Gas's oil and gas operations on Plaintiff's property.

The issues are briefed, and the Court is prepared to issue a ruling.

## II. LAW AND ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a):

> [a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court

---

[14] [Id.]
[15] [Doc. No. 137-2, p. 7]; [Doc. No. 143, p. 15]
[16] [Id.]

> should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a). Further, "[i]f the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013) (internal quotation marks and citation omitted); *see also* FED. R. CIV. P. 56(c)(1).

A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (*citing Anderson*, 477 U.S. at 248). However, in evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. "A non-conclusory affidavit can create genuine issues of material fact that preclude summary judgment, even if the affidavit is self-serving and uncorroborated." *Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020) (citations omitted).

Note that "a district court has somewhat greater discretion to consider what weight it will accord the evidence in a bench trial than in a jury trial." *Matter of Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991); *see also Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978) ("If decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no

4

genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved . . . . The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.").

### B. Analysis

Hallmark argues that certain exclusions in the Policy preclude coverage for the damages sought by Plaintiff in this case. In response, Plaintiff argues that certain riders in the Policy explicitly provide coverage for the damages sought in this case and that Hallmark has failed to demonstrate that the exclusions it cites actually apply. The Court will address each argument below.

#### 1. Insurance Contract Interpretation

An insurance policy is a contract between the parties and should be construed using the general rules of interpretation set forth in the Louisiana Civil Code. *See e.g.*, *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 6/27/03), 848 So. 2d 577, 580; *Carbon v. Allstate Ins. Co.*, 97-3085 (La. 10/20/98), 719 So. 2d 437, 439. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. Civ. Code Art. 2046. If the parties' intent can be "construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate." *See Sims v. Mulhearn Funeral Home, Inc.*, 2007-0054 (La. 5/22/07); 956 So. 2d 583, 590; *Cadwallader*, 848 So. 2d at 580; *see also Edwards v. Daugherty*, 2003-2103 (La. 10/1/04); 883 So. 2d 932, 941 ("Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms.").

### a. The Hallmark Policy

The Policy provides the following definitions:

> **No. 13** — Occurrence means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> **No.15** — Pollutants means any solid, liquid, gaseous or the thermal irritant or contaminant, including smoke vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.
>
> **No. 17** — Property Damage means:
>
>> **a.** Physical Injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>>
>> **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

#### i. The Pollution Exclusion

The Policy contains the following Pollution Exclusion on page four of the Commercial General Liability Coverage Form:

> **SECTION I—COVERAGES**
> **COVERAGE A BODILY INJURY**
> **AND PROPERTY DAMAGE LIABILITY**
>
> **Exclusions**
>
> This insurance does not apply to:
>
> **Pollution**
>
> **(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":
>
>> **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

- **(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

- **(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

- **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke Or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time, transported, handled, stored, treated, disposed of or processed as waste by or for:

- **(i)** Any insured; or

- **(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

However, this subparagraph does not apply to:

- **(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such

7

> > fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;
>
> > **(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operation being performed by you or on your behalf by a contractor or subcontractor; or
>
> > **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".
>
> **(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".
>
> **(2)** Any loss, cost or expense arising out of any:
>
> > **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or
>
> > **(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants". However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.[17]

---

[17] [Doc. No. 137-6, p. 15]

Hallmark cites *Doerr v. Mobil Oil Corporation*, 774 So.2d 119 (La. 2000) to support its argument that the Policy's Pollution Exclusion excludes coverage in the instant case. In *Doerr*, the Supreme Court of Louisiana held that the applicability of a pollution exclusion in any given case will depend upon a "fact sensitive analysis" by the trier of fact of: (1) whether the insured is a "polluter"; (2) whether the injury-causing substance is a "pollutant"; and (3) whether there was a discharge, dispersal, seepage, migration, release, or escape of a pollutant by the insured. *Id.* at 135.

In response, Plaintiff argues that the Pollution Exclusion does not apply. Specifically, Plaintiff argues that the pollution exclusion purporting to exclude coverage for pollution at locations "on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the 'pollutants' are brought on or to the premises, site or location in connection with such operations" does not apply because Hallmark's own expert could not rule out the possibility that WG Gas hauled salt water for other operators and used equipment on Plaintiff's property to store some or all of that salt water.[18] Therefore, Plaintiff maintains that it is not clear whether the salt scarring on Plaintiff's property was caused by pollutants brought onto the Property "in connection with" operations on the Plaintiff's, rather than other operators,' property.[19]

Further, Plaintiff argues that the provision of the pollution exclusion purporting to exclude coverage "on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, 'pollutants'" also does not apply in this case because the work performed on Plaintiff's property was not remedial in nature. Plaintiff notes that it is likely that these activities were undertaken to

---

[18] [Doc. No. 143, pp. 24–25]
[19] [Id. at p. 25]

9

increase the W.G. Gas wells' productive capacities. As explained below, Plaintiff also cites to the existence of certain riders, which seemingly contradict the Pollution Exclusion.

Here, before even considering the existence of riders, there appears to be an issue of fact as to whether the Pollution Exclusion applies. If the pollution was caused by pollutants brought onto the property in connection with operations not undertaken on Plaintiff's property, then the Pollution Exclusion would not exclude those damages. Hallmark's own expert could not rule out this possibility. Further, if the work performed was not remedial in nature, then the portion of the exclusion regarding operations to "test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, 'pollutants'" might not apply. Plaintiffs have not demonstrated that the work performed by WG Gas was purely remedial in nature. Therefore, because issues of fact exist on these points, summary judgment is denied as to the Pollution Exclusion.

### ii. The Damage to Property Exclusion

The Policy also contains an Exclusion for Damages to Property on page five of the Commercial Coverage Liability Coverage Form which provides as follows:

> **J.     Damage to Property**
>
> "Property damage" to:
>
> **(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;
>
> **(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;
>
> **(3)** Property loaned to you;
>
> **(4)** Personal property in the care, custody or control of the insured;

>    **(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
>    **(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
>    Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to damage to Premises Rented to You as described in Section III— Limits of Insurance.
>
>    Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.
>
>    Paragraphs **(3)**, **(4)**, **(5)**, and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.
>
>    Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."[20]

Hallmark argues that, besides the alleged contamination of salt and/or sodium, there was no injury to Plaintiff's property. Therefore, according to Hallmark, the cost of restoring, plugging, and abandoning the wells does not fit under the definition of "property damage" and is not covered under the Policy.[21] As discussed below, Plaintiff argues that this interpretation is contradicted by certain riders or endorsements entered into by Hallmark and WG Gas.

---

[20] [Doc. No. 137-6, pp. 13–14]
[21] [Doc. No. 137-2, p. 15]

       iii. **The "Underground Resources and Equipment Coverage" and "Limited Sudden and Accidental Pollution Liability, Bodily Injury, Property Damage and Clean-up Expenses Extension" Riders**

In response to Hallmark's reliance on the aforementioned exclusions, Plaintiff points to the presence of two riders purporting to grant coverage specific to WG Gas's oil and gas operations on Plaintiff's property.

The "Underground Resources and Equipment Coverage" rider essentially provides that certain property damages are not excluded so long as they relate to oil and gas operations.[22] Specifically, the rider broadly covers up to $1,000,000 in property damage to "any . . . area in . . . which exploration for or production of any substance is carried on . . . ."[23] It also covers property damage related to "any casing, pipe, . . . pump or other drilling or well servicing machinery or equipment located beneath the surface of the earth in any such well or hole or beneath the surface of any body of water."[24] Plaintiff argues that WG Gas "carried on" exploration and production activities by installing wells, laying pipelines, installing tanks, and working in search of oil and gas.[25]

Next, Plaintiff maintains that Hallmark's argument is undermined by the "Limited Sudden and Accidental Pollution Liability, Bodily Injury, Property Damage and Clean-up Expenses Extension" rider. That provision requires Hallmark to cover "property damage" and "clean-up expenses" that are "caused by a sudden and accidental discharge, dispersal, release, or escape of oil or gas or other derivatives or pollutants (including oil refuse or oil mixed with wastes) . . . upon

---

[22] [Doc. No. 137-6, pp. 44–45]
[23] [Id. at p. 45]
[24] [Id.]
[25] [Doc. No. 143, p. 24]

the land (above or below the surface of the ground) . . ..”[26] According to Plaintiff, the existence of this rider controverts Hallmark's assessment of the breadth of coverage exclusions in the Policy.

In response, Hallmark asserts that Plaintiff offered no evidence and has made no claims regarding any of the endorsements provided by the riders.[27] Instead, Hallmark asserts that Plaintiff's claims are for above-ground clean up from a leaking tank.[28] Hallmark also contends that Plaintiff made no claim for a "limited sudden and accidental pollution" in this matter, and cites to another exclusion for underground equipment.[29]

Hallmark's attempt to rebut Plaintiff's reliance on the riders seemingly concedes that there is an issue of fact as to whether the riders apply to provide coverage. It is undisputed that WG Gas left Plaintiff's property in a substandard condition and that it will cost significant sums of money to remediate the deficiency. Whether or not the damage was caused by activity excluded by the Policy or covered under the riders is an issue of fact for the fact-finder to determine. Further, Hallmark's interpretation of the Policy would seemingly nullify the property damage coverage the riders purport to explicitly provide. Finally, even ignoring the existence of the riders, Hallmark has not demonstrated that the exclusions it cites actually apply to the facts in this case. Therefore, because an issue of material fact exists as to these issues, summary judgment is denied.

### III. CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED** that Hallmark's Motion for Summary Judgment on Coverage [Doc. No. 137] is **DENIED**.

---

[26] [Doc. No. 137-6, p. 48]
[27] [Doc. No. 145, p. 2]
[28] [Id.]
[29] [Id. at p. 5]

MONROE, LOUISIANA, this 11th day of August, 2023.

                                                                                                       _____
                                                                                                             Terry A. Doughty
                                                                                                             United States District Judge